[L. A. No. 2998. Department Two.—March 6, 1913.]

## CARLYLE C. DAVIS, Appellant, v. CHARLES C. PARSONS et al., Respondents.

UNDUE INFLUENCE—ASSIGNMENT OF LIFE INSURANCE POLICIES—GIFT BY DAUGHTER TO FATHER—FINDING—CONFLICT OF EVIDENCE.—In an action involving the validity of an assignment by a daughter to her father of certain paid up policies of life insurance, which the trial court found was executed by the daughter without consideration, and as the result of undue influence, coercion, and menace exercised by the father, it is held, upon a review of the evidence, that while the direct evidence in the case strongly preponderates in favor of the fairness of the gift by the daughter to the father, yet where consideration is paid to the character of the daughter, her habits of life, the restraint put upon her under her father's roof, her nervous condition, her apparent inability because of her habits to maintain herself, and the final fact that by this gift she is irrevocably parting with nearly half of her small property, the appellate court cannot hold that the trial court was not justified in declaring the gift to have been one not freely and voluntarily made.

ID.—EVIDENCE—STRIKING OUT—VOLUNTARY EVIDENCE.—It is not error for the trial court to refuse to strike out the voluntary evidence of

a witness, when the evidence would have been admissible if given in response to direct questions asked the witness.

ID.—THREATS MADE TO DAUGHTER—MENTAL CONDITION.—In such action, evidence of certain asserted threats made to the daughter by her stepmother, and of the condition of the daughter's mind, shortly before the execution of the assignment, is admissible.

ID.—REFUSAL TO ANSWER—HUMILIATION OF WITNESS.—A witness may properly refuse to answer questions, if the answers tended unnecessarily to humiliate the witness.

ID.—EVIDENCE OF PHYSICAL AND MENTAL CONDITION.—A witness may testify to the physical and mental condition of the daughter at a specified time, and that she was then purturbed and in tears; and the fact that the witness did not know the cause of the daughter's distress, other than what she had been told, did not render her evidence inadmissible.

ID.—EVIDENCE OF COERCION AND UNDUE INFLUENCE TO IMPEACH LETTER. The daughter may testify that a letter written and signed by her after the execution of the assignment, and on its face purporting to ratify it, was the result of the coercion and undue influence of her father.

ID.—EXCLUSION OF LETTER NOT VOLUNTARY ACT OF DAUGHTER.—It was not error for the court to refuse to admit in evidence a typewritten document purporting to be a letter from the daughter to her trustee, which was not signed by her nor sent to the addressee, where the daughter had testified, and the letter itself bears internal evidence of the fact, that it was not her free voluntary act, and that only some of its expressions were hers and others were those of her father.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. George H. Hutton, Judge.

The facts are stated in the opinion of the court.

John W. Kemp, John S. Mitchell, W. A. Alderson, and Kemp, Mitchell & Silberberg, for Appellant.

Joseph Scott, and James L. Irwin, for Respondent Nellie Madelein Davis.

HENSHAW, J.—This action was brought by Carlyle C. Davis, plaintiff, against his daughter, Nellie Madelein Davis, and against the trustees under the will of Martha Ellen Davis,

mother of Nellie Madelein Davis, by which will certain property of the deceased was devised and bequeathed to the trustees for a period of years in trust for the use and benefit of defendant Nellie Madelein Davis. Summarized, the pleadings amount to this: Of the property and funds of the trust in the hands of the trustees were certain life insurance policies upon the life of plaintiff, which policies plaintiff had made over to his wife, Martha Ellen Davis, when some years before differences had arisen between them, culminating in a divorce. These policies were four in number and were for the aggregate sum of seventeen thousand five hundred dollars. Their surrender value was between eight and nine thousand dollars. The plaintiff pleads that his daughter voluntarily and for a good and valuable consideration assigned and transferred these policies to him on the third day of November, 1906; that the policies were in the hands of the trustees and that before the delivery of the policies to him by the trustees the defendant, Nellie Madelein Davis, attempted to revoke and repudiate her assignment and demanded of the trustees that they do not deliver the policies to the father. The trustees answered, in substance asking the court to define their duties in the premises. The daughter pleads by answer and cross-complaint that her signatures to the purported written assignments were secured from her by the plaintiff through duress, violence, fraud, and undue influence. The court found, in accordance with the allegations of the cross-complaint, that Nellie Madelein Davis never freely nor voluntarily executed the assignments; that they were not executed for a good and valuable consideration; that their execution was not of the free act and will of Nellie Madelein Davis, but that the execution was procured from her by plaintiff through the exercise of undue influence, coercoin, and menace. From the judgment which followed, ordering the cancellation of the asserted assignments and from the order denying his motion for a new trial, plaintiff appeals.

A review of the evidence is made necessary by reason of the fact that the principal contention upon appeal is that it does not support the findings of the court. The necessity of the review in this case is the more unfortunate, not only because of the relationship existing between the plaintiff and the principal defendant, but because as appears from the

more or less veiled intimations of counsel, certain findings of
the court were drawn as inferences from the evidence, rather
than from the positive statements of witnesses. This will be
made the more apparent as the discussion proceeds.

Plaintiff, his former wife Martha Ellen Davis, and their one
child, the defendant Nellie Madelein Davis, lived for many
years in Colorado. The plaintiff was the proprietor of two
daily newspapers in Leadville. At the time of the trial the
plaintiff was over sixty years of age and his daughter thirty-
six years of age. The plaintiff had been in ill health for a
number of years. Differences had arisen between himself and
the mother of defendant which led to their separation and
ultimately to their divorce. As an outgrowth of these differ-
ences and in the settlement of the property rights, plaintiff
made over to his wife these insurance policies fully paid up.
After the divorce the husband married again and with his
second wife came to California. In 1906 the divorced wife
died, leaving, as has been said, her property to trustees in
trust for her daughter. That the plaintiff had been a most
kind and indulgent father to his daughter is abundantly estab-
lished even from the lips of the daughter herself. She had
been educated at home and abroad, studied for three years
in an art school in Paris, spoke French and German, and upon
her return from abroad entered a dramatic school in New
York and went on the stage. In 1895, when her father was ill,
she took charge of his two daily newspapers at Leadville, re-
maining there in charge until 1896, for a period of nearly a
year. Then, upon five thousand dollars being given her by
her father, she returned to New York and engaged in the busi-
ness of furnishing musical, literary, and other entertainment
for social functions. But (this, however, appearing by infer-
ence and intimation rather than by direct proof) the daughter
fell into evil ways and into dissolute habits. She led, or was
willing to lead, an immoral life. She smoked and drank alco-
holic liquors to excess. Thus, in a letter, one of the trustees,
Mr. Parsons, wrote to her upon October 8, 1906, as follows:
"You must realize that your life during the past eight years
with its history of hospitals, sanitariums, etc., is anything but
safe, secure, or dignified. It caused your mother unutterable
woe. I have seen upon her face expressions of intense agony,
of unutterable grief, when speaking of you. I have no doubt

her death was hastened by the overwhelming sorrow that your career brought upon her. She was at times inclined to dispose of her property otherwise than by leaving it to you. Her mother's affection, however, prevailed, but it was her expressed desire that the estate should be preserved for a period of five years in the hope and expectation that during that time a greater sense of responsibility would develop in you. . . . If you leave your father's house and pursue the life you have been leading during the past eight years, we will not respond to your letters and telegrams asking for money beyond the amount we have fixed—no matter what occurs.''

In 1906 plaintiff, with his present wife, Mrs. Mollie Davis, was living upon a tract of land which he had purchased near San Gabriel in Los Angeles County. While there they learned from her letter that defendant was in a sanitarium in San Diego. The wife of plaintiff went to San Diego and, upon the promise of the daughter to reform, to cease smoking and the use of alcoholic stimulants, Mrs. Davis took her to her father's home. Thus, on the last of October or the first of November, 1906, the daughter was received into her father's household. Two or three days afterward, that is to say, upon November 3, the daughter executed, in consideration of love and affection, the assignments to her father of the insurance policies. Of the circumstances connected with and attending these assignments, the plaintiff declares that, though sick and enfeebled, he was by stress of poverty compelled to do manual labor on his home place; that he was so engaged in painting his barn when his daughter came to him, saying that it was too bad that he was forced to do such work at his age, and that she was going to transfer to him the insurance policies which he had given her mother, voicing the hope that he could realize enough money from these policies to make his old age more easy and comfortable. Plaintiff expressed his gratitude to his daughter and told her that he was not physically able to do the work he was compelled to perform; that her proposition was most generous, and that if she carried it out it would enable him to pay his debts and employ some one to do the hard work on his little ranch. At no time did he or did his wife ever suggest to the daughter the assignment of the policies. On November 3d plaintiff had further conversation with his daughter. He was then preparing to go to Los An-

geles to meet Mr. Parsons, one of the trustees of the defendant's estate. The daughter drove with him to the station about a mile away, and on the way told him that she wished him to have the necessary papers prepared while he was in Los Angeles, so that she could execute the assignment. Plaintiff told her that he would have this done and would probably bring a notary public with him on his return to take her acknowledgment. Plaintiff then, while in Los Angeles, did employ Mr. Carl A. Johnson, a practicing attorney, and a notary public, who prepared the assignments; he returned to his home accompanied by Mr. Johnson and also by Mr. Parsons, one of the trustees, whom plaintiff had known for many years. Upon arrival at his home plaintiff testifies further that his daughter followed him into the bathroom and asked him if, after executing these a.signments, she would be expected to pay for her board, to which the father laughingly replied that he thought she "would be entitled to her keep at least." He gave the papers to his daughter, saying, "Here are the papers, Nellie, which you authorized me to have made out." She took them and asked if it was necessary to read them all, to which her father replied that it was not necessary as they were duplicates save in the name and description of the policies. The daughter sat down at a desk, read the papers and then and there signed them, but before signing them he said to her that she must sign them of her free will and for no other reason than that she wanted him to have the money which the policies represented; otherwise, that she must not sign them at all. She signed them, acknowledged them and gave them to him with a kiss. The notary's recollection is that before taking Miss Davis's acknowledgment he asked her if she understood what the instruments meant and that she replied that she did and that it was all right; that it was not true that Miss Davis was crying at the time nor that in answer to his question "Do you do this of your own free will?" she replied that she did it because she had to and had no will of her own. After the execution of the papers they all sat down to dinner and "had a general social conversation, and pleasant evening." Mr. Parsons, the trustee, testifies that upon arrival at the house Miss Davis spoke to him relative to the making of the assignments and asked him if it was all right and he replied: "Nellie, I don't care to advise you in

this matter. This is a matter entirely between you and your father, and besides I am the trustee of this estate, and I would rather you managed those things, I would rather you settled the matter between you and your father. I will say this to you, that if you do sign the papers transferring these policies, you must do it knowing what you are doing and it must be done voluntarily, and free from any pressure or influence of your father or any one else. It must be your voluntary act, I said, otherwise the assignments would not be effective." She made no dissent. The witness never made any suggestion to Miss Davis that she transfer the policies and never in the slightest attempted to influence her to do so. Fixing the surrender value of the policies at about eight thousand dollars, there was ten thousand dollars more remaining in the trust estate so that the gift was of a little less than half of the total trust estate. The trust estate under prudent and economical management yielded a net income of about fifty dollars a month.

The daughter's story is that she never saw her father painting a barn; that she never suggested giving him the policies, but that he said to her that he had paid all the money on the policies and that they really belonged to him. She never volunteered to make an assignment of them to her father, but to the contrary, her father represented that "he had so much property in Los Angeles and he had that beautiful ranch—I have forgotten how much it was worth—how many thousand dollars"; that upon the 3d of November when her father was in Los Angeles she had a serious quarrel with her stepmother who threatened to have her confined as an insane person; that she tried to telephone to get an express wagon to remove her things out of the house and her stepmother struck her and took the telephone from her. Then, in the afternoon when her father, Mr. Parsons and Mr. Johnson arrived, her father took her in the bathroom and told her he was terribly in debt; that the place was mortgaged; that the insurance policies were of no value to her and that if she would make them over to him he would leave her out of his estate as much money, or more, as their value to him; that while he was much harassed by debts at present, in a few years his property would increase enormously in value. "Then we went out into the other room, or we went through the living room and out through

the porch where the desk and table and everything was and
the papers were all ready for me to sign and I signed them.
I didn't know what they were. I didn't read them. They
are very long papers. If I had read them they never would
have got out. So I suppose I didn't ask for proof he would
give me something. He is my father and he always was truth-
ful to me and so I believed he would give me the value of
those things and still I wanted Mr. Parsons to take me to
town and when I signed these I went to Mr. Parsons. He
was in the living room. I said, 'Mr. Parsons, are you going
to witness this? Are you going to witness my giving up every-
thing I own'? He said, 'No, Nellie, that would not do at all.
I am trustee of the estate,' so there was nobody to stand up
for me, and, you know, my room opened off the porch—Mrs.
Davis slept right by my door, and I am afraid of Mrs. Davis.
What more is there?'' When Mr. Johnson, the notary, asked
her if she signed the papers of her own will she said ''I don't
know if you can say I have a free will or right,'' and she was
crying. Mrs. Davis also told her that she could never collect
a cent on the policies and in case of her father's death they
were of no value; that the policies were only good during her
father's lifetime to borrow money on; that she begged Mr.
Parsons when he arrived at the house to take her away as
she was in fear of her life. Mr. Parsons' testimony upon
this is that it did not occur on November 3d, but upon the day
preceding when he was a visitor at the father's home; that
Miss Davis then came out of the house crying and said ''Won't
you take me away from here?'' or something of that kind;
and then said something about some trouble with her step-
mother. ''I said, 'Nellie, I have nothing to do with you per-
sonally,' and I said, 'you must not expect me to take you away
from here,' and then I said 'there is no use of any excitement
about this or worry. I will inquire into it. We will adjust
this matter in some way, perhaps, before I leave.' Soon after
that we sat down and talked and she got over her weeping and
everything was apparently very pleasant and cheerful the bal-
ance of the evening. On November 3d Miss Davis herself
drove us to the house. She was not weeping that evening. I
think she has confounded that with what occurred the night
before.''

The explanation given by Mrs. Davis of the difficulty between herself and her stepdaughter is that the stepdaughter in her craving for liquor sought in every way to indulge her appetite and at times to escape from the parental roof and that it was necessary for her to interfere when the daughter would telephone to the grocery store for liquors or when she was contemplating flight from her father's house. Thus, her father and his wife both testified that upon at least one occasion the daughter demanding money to return to New York, threatened to go to Los Angeles and earn it by an immoral life if it was not given to her. When Miss Davis testified to her fear that her stepmother would poison her, the stepmother insisting upon her taking certain pills, the explanation of the stepmother, herself formerly a trained nurse, is that the pills contained strychnine, were prescribed by a physician to be given to Miss Davis as a stimulant while recovering from her debauch and to furnish aid in resisting her alcoholic craving.

The appellant insists that the evidence of defendant is not inconsistent with the proofs offered by plaintiff, and that in many particulars it is so incoherent and inconsistent with itself that it is not entitled to such credit that a reviewing court will say that it raises a conflict. But here again, drawing the inferences from that evidence which the trial court must have drawn, and with the advantage which the trial court possessed of having the witnesses before it, it seems reasonable to say that these very inconsistencies and incoherencies give evidence of a mind or of a state of mind on the part of the defendant justifying the trial court in withholding its approval of the validity of the assignments. Thus, it matters not if Miss Davis's life was not endangered, if by reason of her mental debility and the nervousness following her protracted period of alcoholism, she believed it to be in danger; it matters not if she entertained hallucinations not produced by the conduct of her father or stepmother. If, in fact, she did entertain them, and through fear of them, however groundless, executed the assignments, it was not the free and voluntary act of a disposing mind. Such we conclude must have been the view which the trial court took of this evidence, and in this view the question of the confidential relation between parent and child enters very little, if at all. By this is meant that such confidential relation need not be established as the

foundation from which to attack the transaction. The case rests upon the salient facts that the dissolute daughter returning to the Davis roof after a protracted alcoholic debauch which ended in a sanitarium, endeavoring by the father's own testimony to escape from that roof, threatening to lead an immoral life to get money to escape, apparently desirous of returning to her former life, necessarily debilitated in health and with ragged nerves, gives to her father nearly one-half of her trust property, declaring that she did so under pressure from her father, in fear of her life and to buy her peace. Again we repeat, that however improbable the narration is in fact, it may well to the mind of the court have seemed that Miss Davis believed the situation to be as she represented, a belief not supported by the conduct of her father, but a distorted belief springing from her own troubled brain. It is concluded, therefore, that a substantial conflict in the evidence is presented, and upon familiar principles this court will not disturb the conclusions found by the trial court.

A subsequent ratification of the assignments is asserted by plaintiff. This ratification springs from the fact that the daughter resided with her father for some months after the execution and repeatedly wrote to the trustees in terms confirming the assignments, in some instances the confirmation being outright, in others conditional. The conditions in one letter, for example, being that the trustees should continue to pay her fifty dollars a month and should turn over to her her mother's jewels. In another the confirmation was based upon the condition that her father and his wife should execute to her some sort of an agreement whereby she should receive the amount of the policies from their estates upon the death of the last survivor. But as to these letters it is shown that they were inspired by the father and in some instances wholly typewritten by him, the daughter doing nothing more than signing her name. True, the father says that the letters were the free act of the daughter and were merely typewritten by him after consultation with her and confirmation by her of their substance. But the daughter's answer is still the same, that she was under her father's roof, under his absolute domination and control, that the trustees did not even pay her monthly fifty dollars to her, but paid it to her father so that she was penniless, and she simply signed whatever she was asked to

sign until later in the year she wrote to the trustees herself repudiating the assignments and consulted a lawyer in Los Angeles about the matter.

Numerous exceptions were taken to the rulings of the court admitting and rejecting evidence. The first of these groups is the refusal of the court to strike out voluntary statements of the witness Nellie Davis. It has been said before that the testimony of Nellie Davis was rambling, in some respects contradictory, in others absolutely incoherent. Appellant asserts that the most glaring of these errors, and it will serve for a type of all, is the following: Shown a typewritten letter signed by herself the court asks "What is the date of this letter?" Mr. Kemp of counsel for appellant replies, "June 21, 1907," when the witness interjects: "Your Honor, I never composed that, and I doubt if I ever wrote it, and yet the signature is mine." The court refused to strike this out. True, it was voluntary. True, it was not in response to any question, but it was perfectly permissible evidence, if questions soliciting it had been asked; and the refusal of the court to strike out the volunteered matter was but a time-saving device, since unquestionably the same evidence would have been adduced under direct question and answer if it had been stricken out.

The second group of exceptions is predicated upon the court's admission of the testimony of Nellie Davis concerning quarrels between herself and her stepmother, Mollie Davis. It may be well to quote this. Miss Davis is constantly asking the court if she may tell her story. Asked if Mrs. Davis ever said anything to her about the policies, she says, "May I tell what she said? Q. No, not unless it is in reference to the assignment of the policies. A. May I say it? The Court: Yes, go on. A. She says 'If you don't do what you are told tonight Mr. Parsons will fix you, and if he don't I will.' And I said 'You cannot do a thing to me, because I have never done anything that you could do anything for.' I was mad and I didn't need to talk like that—

"This was previous to the telephone incident. She said she had doctors that would swear things and she said 'if you land in an insane asylum in California, you will not get out of it,' and she said that Dr. Horn said 'there was nothing the matter with me physically and I was not affected and that I

had not nervous prostration, but that I was mentally wrong'
She told me that on the afternoon of the third and she fur-
ther said, 'if you get locked up in an insane asylum in Cali-
fornia, there was no chance.' I said, 'that is rubbish because
they cannot hold you. They have got to prove in court you
are insane' and she said, 'the testimony of two doctors is suffi-
cient,' and I says, 'no the testimony of two doctors is not
sufficient, they cannot go into court and say you are insane,'
and she says, 'they can in this state,' and I says 'you cannot in
New York,' and she says 'they can in this state, and that is what
they can do to you.' I believed it. But the first time the
policies were mentioned was when my father took me into the
bathroom and this was after the quarrel with my stepmother.''
Manifestly, this evidence had nothing to do with the direct
question of the assignments of the policies, but it is equally
manifest that it gave evidence, first, of asserted threats upon
the part of Mrs. Davis, and, second, of the condition of Miss
Davis's mind. It was therefore admissible.

The third alleged error is in admitting evidence offered by
Miss Davis of occurrences in Leadville. The occurrences
seemed to be the beginning of the marital differences between
the plaintiff and his first wife and involved the stepmother,
the present Mrs. Davis, who was at that time Mr. Davis's
nurse. This evidence of itself amounted to nothing. It was
simply a declaration by the daughter that the present wife
exercised great control over the husband and the conclusion
of the witness that father ''would not have treated me that
way if it had not been for her.'' That there had been differ-
ences was not in question and the representation of Mr. Kemp,
of counsel for appellant, was an invitation to the court to rule
precisely as it did, he saying: ''If the court wants to go into
that proposition we would be very glad to go into it. We
have not a thing to conceal as far as the relations of Mr.
Davis's present wife are concerned.'' Here to insist that the
admission of the evidence thus invited is prejudicial error is
somewhat inconsistent.

The next alleged errors were where the court permitted the
witness Nellie Davis to refuse to answer certain questions.
These questions were addressed to her mode of life and her
vocations in the cities of Chicago and Boston. The ruling
of the court was simply that if the answers tended unneces-

sarily to humiliate the witness she need not give them, and resting upon this perfectly proper declaration of the court she refused to answer. (Code Civ. Proc., sec. 2065.)

The next group of exceptions is addressed to the admission of the testimony of Maria McNally given by deposition. Maria McNally had been a household servant of the Davises and came to California to live with Nellie Davis after the latter had left her father's roof. An example of these objections is the following: Nellie Davis was living in her own bungalow built for her by the trustees near to her father's place. The trustees were still paying the money for the support of Nellie Davis to her father and not directly to her. She was obliged to visit her father's house upon her business affairs in the matter of her bills. The witness testifies to her frequent nervous and crying spells after returning from her father's house and that the troubles of Nellie Davis seemed to have followed these visits. She is then asked: "Q. You never heard Nellie and her father talking about the insurance policy? A. No, sir. I did not. Q. Had you never heard him make any complaint about the size of her bills? A. The grocery bills? Q. Yes. A. I certainly did,—I did not hear him, because I was not there. I heard it from Nellie after she would come back. Q. All you know is what Nellie told you? A. All I know is what Nellie told me. Q. How frequently did she go over to her father's house? A. I do not think she ever went there except on business, and when she got her allowance she did not go over there at all. She went there when she had to go. Q. Did he give her the money, or pay her bills? A. No, he paid the bills. Q. He paid the tradesmen direct? A. Yes." The witness seems to have been a candid one. It was competent for her to testify concerning the condition of Nellie Davis upon her return from her father's home, that she was perturbed and in tears, and the fact that she frankly answers that she was not at Mr. Davis's house, did not hear the conversation and so could not know the cause of Miss Davis's distress other than what Miss Davis herself told her, does not render her evidence inadmissible.

A letter was introduced in the handwriting of Nellie Davis and signed by her. This letter is dated in June, 1907, is addressed to Mr. Walling, attorney for her trustees at Denver,

and "begs leave to state" that the assignment of the insurance policies to her father was executed by the writer freely, and that her father never sought to influence or coerce her in the matter, "and further, whatever promises he has made to me were made subsequent to the two acts mentioned and not made as an inducement or condition." The promises here referred to being promises to secure the defendant out of the estate of her father and his wife. The defendant is allowed to testify, over objection, touching the letter and its contents as follows: "That is not my English. My father composed that letter. I don't remember of ever seeing it, but it is my writing. I suppose it is one of those I signed when my father was in a hurry, when he went to town I had to sign often, because he was going—the postman was going—it was not necessary to read them over because he would tell me what was in the letter. I could not have been familiar with the contents of that letter when I signed it because I don't recognize it now. It is not my composition at all. The contents are new to me." It is asserted by appellant that as respondent admits having written the letter and having signed it, she must have known the contents and is bound by the declarations therein contained. But in this appellant loses sight of the fact that the attack upon the assignments and upon all of this correspondence is that they were the result of coercion and undue influence. As bearing upon these issues the testimony of the witness was in point and admissible.

The court refused admission in evidence of a long typewritten document purporting to be from Nellie Davis to her trustee, Mr. Parsons, the last page of which, however, was in her father's handwriting. This letter was neither signed by Nellie Davis nor sent. But appellant contends that it contains statements negativing much of her testimony and therefore should have been admitted. It was refused admission in evidence, first, for the reasons indicated, that the letter was not signed by Nellie Davis nor sent to its addressee, and, further, because she testifies—and the letter itself bears internal evidence of the fact—that it was not her free voluntary act, that only some of its expressions were hers and others were those of her father. It was not error therefore for the court to refuse to receive this writing.

To sum up therefore it is sufficient to say that while the direct evidence in the case strongly preponderates in favor of the fairness of the gift by the daughter to the father, yet when consideration is paid to the character of the daughter, her habits of life, the restraint put upon her under her father's roof, her nervous condition, her apparent inability because of her habits to maintain herself, and the final fact that by this gift she is irrevocably parting with nearly half of her small property, it may not be said that the trial court was not justified in declaring that gift to have been one not freely and voluntarily made.

The judgment and order appealed from are therefore affirmed.

Melvin, J., and Lorigan, J., concurred.